## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       Plaintiff,

v.

QUENTIN KIRK LAWTON,

       Defendant.

Case No. 16-40036-01-DDC

## MEMORANDUM AND ORDER

This matter comes before the court on defendant Quentin Kirk Lawton's Motion to Suppress Evidence (Doc. 32). Defendant contends that the court must suppress (1) evidence seized from his cell phone; (2) statements he made in Larry's Shortstop parking lot; and (3) statements he made during an interrogation at the Topeka Police Station. Defendant contends that law enforcement officials initially lacked a constitutional basis to stop him in Larry's Shortstop parking lot. And, defendant contends that the police obtained his statements there in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). The government counters, contending that the officers had probable cause when they stopped defendant and that the government did not violate defendant's *Miranda* rights. For reasons explained below, the court grants in part and denies in part defendant's Motion to Suppress.

### I.    Factual Background

The court takes the following facts from evidence presented at the September 22, 2016 motion hearing, and, where undisputed, from the parties' briefs.

On April 23, 2016, federal agents and task force officers, including the United States Marshals Service, sought to arrest Orlando J. Collins on an outstanding federal arrest warrant.

1

The marshals had been trying to locate Mr. Collins since April 2016.  In his role as part of the fugitive task force, Deputy Viera was attempting to locate Mr. Collins.  Deputy Viera's responsibilities included conducting interviews, conducting phone surveillance, and mining for social media information about Mr. Collins.  In his investigation, Deputy Viera found a video on Mr. Collin's Facebook page.  The video featured Mr. Collins shooting firearms with defendant's son, Quentin Lawton, Jr.

Around 2:00 P.M. on April 23, 2016, the marshals began receiving information from a phone that they believed to be associated with Mr. Collins.  That information led them to believe that Mr. Collins was located somewhere on the grounds of the Country Club Motel in Topeka, Kansas.  Federal agents and officers set up surveillance around the Country Club Motel.  Around this time, an officer retrieved a guest list from the motel staff.  The list revealed that Stanley Lawton, defendant's father, was renting room 28 at the motel.  This was noteworthy for the officers because a torched vehicle had been discovered near Stanley Lawton's home the day before and their subject, Mr. Collins, was the suspected perpetrator.

Deputy Viera and Deputy Sinclair parked Deputy Viera's Chevy Tahoe in a parking lot near the motel.  From their surveillance point, the deputies could see the entrance and exit to the motel's parking lot.  The deputies waited for a long time in the car and while they were waiting, the deputies used their computers to gather more information.  The deputies learned that defendant had been involved in a prior federal case and was currently in the custody of the Bureau of Prisons designated to a reentry center known as the Grossman Center Halfway House. The deputies also learned that defendant had a suspended driver's license.

At about 9:15 P.M. on April 23, 2016, Deputy United States Marshal Andrew saw a man leave room 28 at the motel, get in a car, and drive out of the motel parking lot.  Deputy Andrew

transmitted the following information to Deputies Viera and Sinclair by radio:  a subject had come out of room 28 wearing a white shirt, blue jeans, and a white head wrap on his head; and the man was driving out of the motel parking lot in a black four-door sedan.  Deputy United States Marshals Viera and Sinclair watched the car leave the motel parking lot.  Deputies Viera and Sinclair followed the sedan in their vehicle and it eventually turned into the parking lot for Larry's Shortstop, a retail convenience store located south of the Country Club Motel.

The deputies were able to identify the car's license plate number.  After broadcasting the number over the radio, the deputies learned that the car was registered to Stanley Lawton, defendant's father.  The deputies watched as the man entered the convenience store and they knew it was the same man who left room 28 at the motel.

The man left the convenience store.  When he got back in the sedan, the deputies parked their vehicle behind his sedan.  They also had activated their vehicle's emergency lights.  They parked their vehicle so it would be difficult for the sedan to pull out of the parking lot.  Deputy Viera approached the driver side door while Deputy Sinclair approached and stood near the passenger side door.  Deputies Viera and Sinclair were each wearing typical field clothing for deputies—cargo pants, polo shirts with the Marshal Service insignia, tactical vests, and duty belts.  Two other task force officers, Agent Salmon and Agent Bloomfield with the Topeka Police Department, walked up and stood a few feet behind the sedan.  None of the officers drew their weapons.

Deputy Viera made contact with the man when he opened his driver side door.  As the deputies approached, Deputy Viera had observed the man attempting to use his cell phone.  So Deputy Viera reached inside the vehicle, took the man's cell phone, and set it on the roof of the car so he couldn't use it.  As soon as Deputy Viera got to the door he recognized the man who

had driven the sedan to the convenience store as defendant Quentin Lawton, Sr. Deputy Viera asked defendant where he was coming from. Defendant replied that he had come from Larry's Shortstop. Deputy Viera asked again, explaining that he meant before he entered the convenience store. Defendant again replied that he had been at Larry's Shortstop. Deputy Viera informed defendant that lying to him was a federal offense. Defendant continued to tell Deputy Viera he had been at the Shortstop. For simplicity, this Memorandum and Order refers to Deputy Viera's exchange with the defendant in the parking lot as "the first interview."

Deputy Viera detained defendant and called the Topeka Police Department for back up. A Topeka police officer arrived at Larry's Shortstop parking lot at about 9:45 P.M. The defendant was taken out of his car, handcuffed, and placed in the backseat of the Topeka Police Officer's car. The Topeka Police officer kept defendant in the car awaiting instructions from the deputies until defendant was eventually taken to the Topeka Police Department. Defendant was then led to an interrogation room where his handcuffs were removed. At about 1:10 A.M. on April 24, 2016, two FBI task force officers read defendant his *Miranda* rights and began interrogating defendant. This Memorandum and Order refers to these exchanges at the Topeka Police Department as "the second interview."

## II.    Analysis

In his brief and at the September 22, 2016 hearing, defendant contended that the court should suppress the following evidence: (1) any evidence discovered on defendant's cell phone; (2) defendant's statements to Deputies Viera and Sinclair in the first interview in Larry's Shortstop parking lot; and (3) defendant's statements to task force officers at the Topeka Police Department during the second interview. Defendant argues that the Fourth and Fifth Amendments require the court to suppress this evidence. First, defendant contends that law

enforcement seized defendant in Larry's Shortstop parking lot without a constitutional basis to do so.  Second, defendant contends that the deputies had defendant in custody in the parking lot and interrogated defendant in violation of his *Miranda* rights.  Third, defendant contends that the officers lacked probable cause to arrest defendant.  And, at the hearing on September 22, 2016, defendant asserted that his statements to law enforcement officers during the second interview should be suppressed because defendant did not voluntarily waive his *Miranda* rights.  The court addresses each argument, in turn, below.

## A.  Cell Phone Evidence

Defendant argues that law enforcement officers violated his Fourth Amendment rights when they seized him, and, as fruit of the illegal seizure, the court should suppress any evidence acquired from defendant's cell phone.  The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV. To determine whether defendant's Fourth Amendment rights were violated, the court must first determine when during the encounter the Fourth Amendment became relevant.  *United States v. Beamon*, 576 F. App'x. 753, 756 (10th Cir. 2014).  Then, "[i]f the Fourth Amendment is implicated," the court "must determine the nature of the encounter and whether it was justified by either reasonable suspicion or probable cause 'at that time—not a moment before.'"  *Id.*  The exclusionary rule, which the Supreme Court formulated to remedy Fourth Amendment violations, prohibits the government from admitting evidence acquired as a direct or indirect result of an unconstitutional search or seizure.  *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

### 1. Seizure

A person is seized at the juncture when, by means of physical force or a show of authority, his freedom of movement is restrained.  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  "To determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."  *Florida v. Bostick*, 501 U.S. 429, 439 (1991).  Consistent with precedent, our court uses several factors to determine when a defendant is seized.  These factors include:  (1) whether the encounter occurred in a nonpublic space; (2) whether the officers confronting the defendant were armed or uniformed; (3) whether more than one officer confronted the defendant; (4) whether the officers exhibited a coercive demeanor; (5) whether the officers asked potentially incriminating questions.  *United States v. Robinson*, No. 99-10018-01, 1999 WL 358742, at *2 (D. Kan. May 12, 1999) (quoting *United States v. Glass*, 128 F.3d 1398, 1406 (10th Cir. 1997)).  Also, our court has identified several other factors to determine whether a reasonable person would have felt free to leave.  Factors that indicate a reasonable person would not feel free to leave include:  (1) the threatening presence of several officers; (2) a display of a weapon by an officer; (3) some physical touching by an officer; (4) use of language or tone of voice indicating that compliance with the officer is compulsory; (5) prolonged retention of a person's personal effects.  *Id.* at *3 (quoting *United States v. Laboy*, 979 F.2d 795, 798 (10th Cir. 1992).  No one factor is dispositive, but, "one factor of particular significance . . . is whether the officer has physically impeded the path of the person to whom he is speaking."  *Id.*

6

In *United States v. Robinson*, our court held that a seizure occurred when an officer parked his vehicle two feet in front of the subject's car and in its path. *Id.* at *1. The officer in *Robinson* did not activate his vehicle's flashing lights, display his weapon, or use a harsh tone. *Id.* at *3. But, the officer was in uniform, was in a marked vehicle, and, importantly to the court, had impeded the path of the subject's vehicle. *Id.* The court concluded that taking all the factors together, a reasonable person "only [could] have interpreted the officer's parking of his patrol car as a signal that he was specifically and intentionally preventing further forward movement of the [subject's] vehicle." *Id.* at *4. Our court determined that this constituted a seizure.

Applying *Robinson*'s standard, the court finds that the seizure of Mr. Lawton began when Deputy Viera parked his vehicle behind defendant's car. Like the officer in *Robinson*, Deputies Viera and Sinclair were dressed in official gear—cargo pants, polo shirts displaying the Marshal's Service star, tactical vests, and duty belts. Deputy Viera had activated his vehicle's emergency lights when they positioned themselves behind defendant. And, importantly, Deputy Viera parked his vehicle so that defendant would have had difficulty maneuvering his car to leave the parking lot. Thus, defendant was seized and the Fourth Amendment was implicated from the moment that the deputies parked behind him.

In its brief, the government does not seriously contest that defendant was effectively seized for Fourth Amendment purposes when the deputies parked their car behind him with their lights on. Instead, the government focuses its argument on whether the deputies had the constitutional requisite reasonable suspicion when they seized defendant.

## 2. Reasonable Suspicion

A warrantless arrest by law enforcement officers is reasonable under the Fourth Amendment where there "is probable cause to believe that a criminal offense has been or is

being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  It is well settled that "if an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).  And, the Supreme Court recognizes that "in some circumstances an officer may detain a suspect briefly for questioning although he does not have probable cause to believe that the suspect is involved in criminal activity, as is required for a traditional arrest." *Brown v. Texas*, 443 U.S. 47, 51 (1979) (internal quotation marks omitted).  This is commonly known as a *Terry* stop.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

A *Terry* stop requires that officers have "a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown*, 443 U.S. at 51.  "Reasonable suspicion is established if the totality of the circumstances suffices to form a particularized and objective basis for a stop." *Poolaw v. Marcantel*, 565 F.3d 721, 736 (2009) (internal quotation marks omitted).  The level of suspicion required for reasonable suspicion is "considerably less than proof by a preponderance of the evidence or that required for probable cause." *Id.* (internal quotation marks omitted).  "Officers merely need an articulable reasonable suspicion that criminal activity may be afoot." *Id.*

At the hearing on September 22, 2016, Deputy Viera testified that by the time he recognized the man in the driver's seat as Mr. Lawton, the deputies already knew that defendant had just recently been released from prison and remained in the custody of the Bureau of Prisons at the Grossman Center in Leavenworth, Kansas.  And, the officers had observed that the man later identified as the defendant was likely associating with a known fugitive in Topeka.  This alone, according to the government, raises the suspicion level beyond what is necessary to

conduct a *Terry* stop.  Also, the deputies knew that defendant's driver's license was suspended.

So, Deputy Viera knew that defendant had driven the sedan to the convenience store and thus

violated Kan. Stat. Ann. § 8-262(a)(1).  This knowledge, the government argues, constitutes

sufficient probable cause, or at minimum, reasonable suspicion to stop defendant under the

Fourth Amendment.

But Deputy Viera testified that he did not recognize the man as Quentin Lawton, Sr. until

he approached and opened the driver side door of defendant's car.  And, in *Terry v. Ohio*, the

Supreme Court held that a judge evaluating the reasonableness of a particular seizure must assess

the facts "available to the officer *at the moment* of the seizure."  392 U.S. 1, at 21–22 (1968)

(emphasis added).  So, whether the deputies' seizure was constitutional turns on what the

deputies knew when the seizure began—at the moment they parked their vehicle behind

defendant's car.

When the deputies parked their car behind defendant, the evidence shows that the

deputies knew:  (1) that law enforcement believed that Mr. Collins was on the grounds of the

Country Club Motel in room 28; (2) that Stanley Lawton, defendant's father, had rented room 28

of the motel; (3) that Mr. Collins was suspected of torching a car one day earlier and that this car

was discovered near Stanley Lawton's home; (4) that Mr. Collins had a relationship with

Quentin Lawton, Jr., defendant's son; (5) that defendant was in custody of the Bureau of Prisons

at a halfway house; and (6) that defendant's driver's license was suspended.  But until Deputy

Viera recognized defendant as Quentin Lawton, Sr., the deputies knew only that a lone male had

left room 28 of the Country Club Motel and was now parked in the Larry's Shortstop parking lot.

Still, the court concludes that the deputies had the requisite reasonable suspicion to stop

defendant when they parked their vehicle behind his car.  Reasonable suspicion requires merely

an articulable reasonable suspicion that criminal activity may be afoot.  Defendant contends that the deputies lacked reasonable suspicion because the deputies knew only that the man in the car had been in the hotel room with Mr. Collins, and "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause."  *Poolaw*, 565 F.3d at 729.  Indeed, in *Brown v. Texas*, the Supreme Court noted that an individual's presence in an area of expected criminal activity, standing alone, is not enough to support reasonable suspicion.  *Brown*, 443 U.S. at 99.  But here, the man was more than just present in an area of suspected criminal activity.  The man was seen leaving the same motel room where law enforcement officers believed that Mr. Collins was evading arrest.  Thus, Deputies Viera and Sinclair were able to point to specific and articulable facts supporting a reasonable suspicion that the man was involved in criminal activity when the seizure began.  And, once deputies Viera and Sinclair recognized the driver as the defendant, they had the requisite probable cause to arrest defendant because they knew by then that Mr. Lawton had driven the sedan even though the state of Kansas had suspended his driver's license.[1]

At the hearing on September 22, 2016, defense counsel asserted that Deputy Viera, by reaching into the driver's side of defendant's car to remove the cell phone, searched and seized but without any probable cause.  But, as discussed above, when Deputy Viera recognized the driver as the defendant, he had probable cause to arrest defendant for the traffic violation.  The deputies' seizure of defendant and defendant's cell phone did not violate the Fourth Amendment, and the exclusionary rule does not provide a basis to suppress evidence seized from defendant's cell phone.

---

[1] Violating Kan. Stat. Ann. § 8-262(a)(1) is an arrestable offense.

Defendant does not contend that law enforcement unlawfully searched the cell phone without a warrant.  In *Riley v. California*, the Supreme Court held that a warrant is generally required to search a suspect's cell phone, even when a cell phone is seized incident to a lawful arrest.  134 S. Ct. 2473, 2493 (2014).  Here, defendants only contend that any evidence taken from defendant's cell phone should be suppressed because it was fruit of the initial seizure of defendant in Larry's Shortstop parking lot.  The court concludes that the deputies' initial seizure of defendant was lawful.

### B.  Defendant's Statements in Larry's Shortstop Parking Lot

Defendant also moves to suppress his statements to the deputies during the first interview, i.e., in the Larry's Shortstop parking lot.  Defendant contends that the deputies obtained the statements in violation of his Fifth Amendment rights.  The Fifth Amendment protects an individual's right against self-incrimination.  U.S. Const. Amend. V.  In *Miranda v. Arizona*, the Supreme Court articulated procedural safeguards for "in-custody interrogation" of persons suspected or accused of a crime.  384 U.S. at 467.  To permit an in-custody individual the "full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights" and those rights must be fully honored.  *Id.* Thus, before an interrogation can begin, an accused must be informed of and must waive certain rights.  *United States v. Bautista*, 145 F.3d 1140, 1146 (1998).  The prosecution may not use statements, "whether exculpatory or inculpatory, stemming from custodial interrogation of defendant" unless it demonstrates "the use of procedural safeguards effective to secure the privilege against self-incrimination."  *Miranda*, 384 U.S. at 444.  But, in order to implicate *Miranda*, both a "custodial situation" and "interrogation" are required.  *Id.* at 1147.

### 1.  Custody

The "duty to give *Miranda* warnings is triggered only where there has been such a restriction on a person's freedom as to render him in custody." *Thompson v. Keohane*, 516 U.S. 99, 107 (1995) (internal quotation marks omitted).  An individual is considered "in custody" if, under all the circumstances, a reasonable person would not have felt free to terminate the encounter and leave.  *Yarborough v. Alvarado*, 541 U.S. 652, 663–664 (2004).  "The determination of whether a defendant was in custody for purposes of *Miranda* is based on the totality of the circumstances; thus, it is necessarily fact intensive." *Bautista*, 145 F.3d at 1146.  The court "must determine whether a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest." *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008) (internal quotation marks omitted).

Our Circuit directs district courts to consider several non-exhaustive factors to determine whether the suspect was in custody.  *Id.* at 1240.  Some of these factors include:  (1) whether the suspect is made aware that he is free to refrain from answering questions or to end the interview at will; (2) the nature of the questioning; and (3) whether the police dominate the encounter.  *Id.* But, while these factors are helpful guideposts, the court should look at the totality of the circumstances.  *Id.*

The defendant asserts that he was in custody in the parking lot under the Tenth Circuit's factors.  First, defendant argues that the police dominated the encounter because the deputy marshals "physically prevented [defendant] from leaving by blocking his car with theirs, with its emergency lights flashing."  Doc. 33 at 16.  And the officers carried firearms and wore bulletproof vests that identified them as law enforcement.  Second, defendant contends that the officer's questioning was "accusatory and coercive" because Deputy Viera told defendant that

lying to a federal officer is a criminal offense. *Id.* Finally, defendant points to the fact that the officers never told defendant that he could terminate the encounter or stop answering questions. *Id.* Instead, according to defendant, Deputy Viera conveyed that he had to answer his questions or he would be in trouble. Taking these facts together, defendant contends that a reasonable person in his position would not have felt free to terminate the encounter and leave.

The government contends that defendant was not in custody because the encounter between the deputies and defendant was more like a regular traffic stop based on reasonable suspicion than an arrest. To support its argument, the government contends that none of Deputy Viera's questions could be considered coercive under the circumstances. Deputy Viera asked defendant where he had come from, and the government asserts that neither this question nor any of his follow-up questions could be considered so dominating that a reasonable person in defendant's position would not have felt free to end the encounter and leave.

While the court already has determined that defendant was seized for Fourth Amendment purposes, this is a separate inquiry from whether a person is in custody for Fifth Amendment purposes. *See United States v. Revels*, 510 F.3d 1269, 1273 (2007) (discussing the Supreme Court's holding in *Berkemer v. McCarty*, 468 U.S. 420 (1984), and holding that motorists subject to "garden variety" traffic stops are not entitled to *Miranda* warnings). This is because "the atmosphere surrounding an ordinary traffic stop is substantially less 'police-dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself." *Id.* (quoting *Berkemer*, 468 U.S. at 438–39). But, if a motorist has been detained pursuant to a traffic stop and is thereafter "subjected to treatment that renders him 'in custody' for practical purposes," he is entitled to the "full panoply of protections prescribed by *Miranda*." *Id.* at 1274.

The court concludes that defendant was in custody for *Miranda* purposes.  When the deputies seized defendant it amounted to more than a garden variety traffic stop.  Law enforcement dominated the encounter.  Defendant was sitting in his parked car when Deputy Viera's vehicle pulled up behind him with its emergency lights flashing, preventing defendant from driving away.  Deputy Viera approached defendant on the driver's side door of defendant's car and Deputy Sinclair stood on the passenger side.  Two additional officers stood a few feet behind defendant's car, effectively surrounding defendant.  All four officers wore official tactical vests and had firearms on their bodies.  Thus, defendant was subject to a police dominated atmosphere when Deputy Viera began asking him questions.

The nature of Deputy Viera's questioning also suggests that defendant was in custody.  Deputy Viera initially asked defendant where he came from.  But, when defendant did not give Deputy Viera the answer he was seeking, Deputy Viera told defendant that lying to an officer was a federal offense.  This type of questioning in these circumstances is coercive in nature.  And when Deputy Viera approached defendant, he immediately took defendant's cell phone out of his hand and placed it on the top of the car.  This action certainly did not portray that Mr. Lawton was free to terminate and leave.  Finally, the court notes that defendant was not told that he could terminate the encounter.  Taken together, these factors establish that defendant was in custody because a reasonable person would not have felt free to terminate the encounter and leave.

### 2.  Interrogation

The next step in the analysis is whether Deputy Viera's questioning amounted to an interrogation for Fifth Amendment purposes.  "[I]nterrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those

14

normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (internal quotation marks omitted). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* This is because the procedural safeguards of *Miranda* "were designed to vest a suspect in custody with an added measure of protection against coercive police practices." *Id.*

The Tenth Circuit has found that even facially benign statements can amount to an interrogation, depending on the likelihood of triggering an incriminating response. *See Abraham v. Kansas*, 211 F. Supp. 2d 1308, 1321 (D. Kan. 2002) (discussing the Tenth Circuit's holding in *United States v. Perdue*, 8 F.3d 1455, 1465 (10th Cir. 1993)). In *United States v. Perdue*, the Tenth Circuit held that the police officers' questions constituted an interrogation for *Miranda* purposes. 8 F.3d 1455 (10th Cir. 1993). The officers in *Perdue* entered a parcel of property primarily used by the defendant to grow marijuana. *Id.* at 1465. The officers asked the defendant, "What are you doing here?" *Id.* The Tenth Circuit found that, given the fact that Mr. Perdue was entering a parcel of property used to grow marijuana, the question, "What are you doing here?" was designed to elicit an incriminating response. *Id.*

In *Abraham v. Kansas*, our court found that police had interrogated a defendant despite the facially benign nature of the question. 211 F. Supp. 2d at 1321. In *Abraham*, the defendant informed a law enforcement officer that he would not consent to a search of his hotel room because he had "stuff" in the room he did not want the officers to find. *Id.* The officer then asked the defendant, "What do you mean by stuff?" *Id.* The court determined that the question was reasonably likely to elicit an incriminating response because a reasonable implication of defendant's statement communicated that the "stuff" was contraband. *Id.*

Here, the government contends that Deputy Viera's question—"Where did you come from?"—was completely benign under the circumstances and not designed to elicit an incriminating response.  Doc. 40 at 13.  The government asserts that Deputy Viera knew that defendant had left room 28 at the motel and come to Larry's Shortstop and that nothing would have suggested to the officers that defendant "would lie about the obvious fact of what had just occurred in the presence of law enforcement."  *Id.*  And, the government contends, the following questions, and that Deputy Viera reminded defendant that it is a crime to lie to law enforcement, was not designed to elicit an incriminating response.  *Id.*  Instead, according to the government, it was designed to "encourage the defendant to tell the truth."  *Id.*

But the court does not focus on the intent of law enforcement when determining whether a suspect was interrogated for *Miranda* purposes.  *Innis*, 446 U.S. at 301.  Rather, the court focuses on the suspect's perceptions.  *Id.*  And at the hearing on September 22, 2016, defense counsel asserted that when Deputy Viera asked defendant where had he come from, he already knew that defendant was driving on a suspended license.  So, defense counsel asserted, Deputy Viera's questions were going to elicit an incriminating response no matter how defendant answered.  A reasonable person in defendant's shoes would have perceived the question as designed to elicit an incriminating response.

The government asserted in its brief and at the hearing that when Deputy Viera recognized defendant, he knew that defendant was in the custody of the Bureau of Prisons at the Grossman Center Halfway House.  And Deputy Viera knew that defendant's driver's license was suspended.  So, if defendant answered truthfully, conceding that he had driven from the motel to the convenience store, defendant would have admitted to violating Kan. Stat. Ann. § 8-262(a)(1) because he was driving on a suspended license.  Or, possibly, defendant would have admitted

16

that he was violating conditions of his custody at the halfway house because he was in Topeka at Larry's Shortstop.  The court thus concludes that defendant was interrogated for Fifth Amendment purposes when Deputy Viera questioned him in Larry's Shortstop parking lot.  Because defendant was in custody when interrogated there, defendant should have been given *Miranda* warnings.  And under *Miranda*, because law enforcement did not use procedural safeguards before questioning defendant, the prosecution may not use defendant's statements made during the first interview in the parking lot of Larry's Shortstop.

### C. Defendant's Statements in the Interrogation Room at the Topeka Police Department

Defendant presents two arguments for suppressing defendant's statements made in the interrogation room at the Topeka Police Department.  In his brief, defendant asserted that the court should suppress the second interview as a result of the initial seizure and un-*Mirandized* statements.  And, at the hearing, defense counsel asserted that even if the court finds that the second interview should not be suppressed as fruit of the seizure, the court should suppress defendant's statements made at the Topeka Police Department because defendant did not voluntarily waive his *Miranda* rights.

### 1. Whether defendant's statements should be suppressed as fruit of the unlawful seizure

Defendant's first argument fails because the deputies' seizure was not unlawful.  And, though the deputies failed to give defendant his *Miranda* warnings in the parking lot, it is undisputed that the task force officers read defendant his *Miranda* rights before the second interview.  The Supreme Court has held that the "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."  *Oregon v. Elstad*, 470 U.S. 298, 314 (1985).  In *Elstad*, the Supreme Court rejected the theory that "the

initial, unwarned statement creates a 'lingering compulsion'" that necessarily excludes later statements given after *Miranda* warnings.  *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1149 (10th Cir. 2006) (quoting *Elstad*, 470 U.S. at 311)).  And, in *Missouri v. Seibert*, the Supreme Court, in a plurality opinion, listed five relevant facts that bear on whether *Miranda* warnings given midstream are effective.  542 U.S. 600, 601 (2004).  They are:  (1) the completeness and detail of the questions and answers to the first round of questioning; (2) the overlapping content of the two statements; (3) the timing and setting of the first and second interrogation; (4) the continuity of police personnel; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.  *Carrizales-Toledo*, 454 F.3d at 1150 (discussing *Seibert*, 542 U.S. at 615).

Here, four of the *Seibert* factors weigh against defendant's arguments that the court should suppress his statements from the second interview.  First, the questions and answers between defendant and Deputy Viera in the first interview were limited.  Deputy Viera asked defendant where he had come from.  Defendant replied he had come from Larry's Shortstop. The pair then repeated their question and answer.  This exchange was hardly extensive.  Second, the second interview took place four hours after the first interview and in a new location.  Third, the two interviews were conducted by different law enforcement personnel.  Deputy Viera conducted the first interview.  Task force officers conducted the second interview.  Finally, no facts indicate that the interrogator's questions treated the second interview as continuous with the first.  The court realizes that some overlap existed between defendant's statements in his first interview and his statements at the second.  In both interviews, defendant describes that he had come from Larry's Shortstop when the deputies stopped him.  But this factor does not outweigh the others to create a lingering compulsion rendering the second interview statements

involuntary.  Thus, no basis exists for suppressing defendant's statements made to task force officers during the second interview at the Topeka Police Department as a result of the deputies' failure to give defendant his *Miranda* warnings before the first interview.

### 2.  Whether defendant voluntarily waived his rights

At the hearing, defense counsel argued that defendant's statements in the second interview did not constitute a voluntary waiver of his *Miranda* rights.  After a suspect is given *Miranda* warnings, he "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 445.  "[G]iving the warnings and getting a waiver has generally produced a virtual ticket of admissibility." *Seibert*, 542 U.S. 608–09.  "The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry." *Dickerson v. United States*, 530 U.S. 428, 444 (2000).  But, "maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver." *Seibert*, 542 U.S. at 609; *see also Berkemer*, 468 U.S. at 433 n.20 ("We do not suggest that compliance with *Miranda* conclusively establishes the voluntariness of a subsequent confession.  But cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.").

"To establish a waiver of Fifth Amendment rights, the government must show:  (1) that the waiver was voluntary in the sense that it was a product of free and deliberate choice rather than intimidation, coercion, or deception; and (2) that the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving." *United States v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996).  "Only if the totality of the circumstances

19

surrounding the interrogation shows both an uncoerced choice and the requisite level of comprehension can a waiver be effective." *Id.*

Here, the evidence shows and the court finds that defendant voluntarily waived his rights. Defense counsel argued that defendant's statement was not voluntary because his statements were premised on the officer's statements that he was not being charged with an offense. Defense counsel contends that a reasonable person would rely on the statement to waive their Fifth Amendment rights and speak with the officers. But, the task force officers did not tell defendant that he would never be charged with an offense. When defendant asked, "Am I being charged?" the task force officers answered, "No." Gov. Ex. 1. This statement was true. The record contains no evidence of deception or coercion by the officers. The officers did not promise defendant anything. And, nothing in the record suggests that defendant lacked a full awareness of the rights he was waiving, or that his waiver was the product of anything other than free and deliberate choice. The officers read defendant his *Miranda* rights and asked defendant if he understood them. Defendant answered, "Yeah." Gov. Ex. 1. The officers asked defendant if he had heard the rights before. Defendant answered, "Yeah." *Id.* And, before the officers continued their questioning, they informed defendant that lying to federal officers is a crime under the federal system, so if he was going to tell him anything, it should be the truth. *See Id.* Defendant chose to waive his rights when he continued speaking with the officers. *Miranda* provides no basis for suppressing the statements defendant made during the second interview.

## III.    Conclusion

Deputies Viera and Sinclair did not violate defendant's Fourth Amendment rights when they stopped him in Larry's Shortstop parking lot. Thus, the Fourth Amendment does not provide a basis for suppressing evidence seized from defendant's cell phone. But, because the

deputies obtained defendant's statements in the parking lot in violation of his Fifth Amendment rights, those statements should be suppressed.  Finally, because defendant voluntarily waived his Fifth Amendment rights before the second interview, *Miranda* provides no basis for suppressing defendant's statements during the second interview.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion to Suppress (Doc. 32) is granted in part.  Defendant's motion to suppress his statements to deputies in Larry's Shortstop parking lot on April 23, 2016 is granted.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant's Motion to Suppress (Doc. 32) is denied in part.  Defendant's motion to suppress evidence taken from his cell phone is denied.  Defendant's motion to suppress statements made in the Topeka Police Department Interrogation room in the early morning hours of April 24, 2016 is denied.

**IT IS SO ORDERED.**

**Dated this 20th day of October, 2016, at Topeka, Kansas.**


**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**